N THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ABDUL M. LOVE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 06 CV 1537 |
| v. ) | |
| ) | Judge Joan H. Lefkow |
| SGT. NOVARRO, SGT. KIRK, ) | |
| LT. MERCADO, GARY DEL RE, ) | |
| GARY STRYKER, PATRICK FIRMAN, ) | |
| BRETT KLEIN, WAYNE HUNTER, ) | |
| and DR. FATOKI, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Abdul M. Love, has filed suit under 42 U.S.C. § 1983 against defendants, employees of the Lake County Sheriff's Department, for violating his due process rights under the Fourteenth Amendment, alleging in Count I that while he was being held in pre-trial detention at Lake County Correctional Center defendants moved him from the general inmate population to the Administrative Segregation Unit for disciplinary reasons but failed to provide him a disciplinary hearing.[1] The court has jurisdiction to hear this case under 28 U.S.C. §§ 1331 and 1343.

Before the court is defendants' motion for summary judgment. For the following reasons, the motion [#94] will be granted.

---

[1] In addition, plaintiff asserted a Fourteenth Amendment claim in Count II that certain individual defendants displayed deliberate indifference to his medical needs. *See* Fifth Am. Compl. at 8–9. On May 8, 2008, the court granted defendants' motion to dismiss this count and the defendants who had not been sued in Count I. *See* Minute Order of May 8, 2008.

**STANDARDS**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in the depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) & advisory committee's notes. The party seeking summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

**BACKGROUND[2]**

In October 2005, Love was charged in Lake County with felony possession of cocaine with intent to deliver. On October 5, 2005, Love was arrested on the cocaine charge and brought to the Lake County Correctional Center ("LCCC"), where he remains as a pretrial detainee. Love

---

[2] Unless otherwise noted, both sides have admitted the following facts.

was initially housed in a general population inmate pod, within which inmates are generally allowed to move around freely and are not locked in individual cells.

Subsequently, defendant Patrick Firman, Chief of Corrections for the Lake County Sheriff's Department, was advised by the Criminal Investigations Division ("CID") of the Lake County Sheriff's Department that Love, while housed in the general inmate population, had attempted to solicit the murder of a police officer involved in his pending criminal case. Love was indicted and charged with attempting to solicit murder based on this alleged conduct.

After being advised of Love's alleged conduct, Firman decided to move Love from the general inmate population to the Administrative Segregation Unit ("ASU"). The ASU houses inmates in disciplinary detention status and in "protective custody" status, the latter referred to in this case as "administrative security segregation."

The purpose of an administrative security segregation is to prevent harm to the inmate and others. The purpose of disciplinary segregation, on the other hand, is to punish and correct misbehavior within the jail.[3] With a disciplinary segregation, the inmate is given a hearing. After the hearing, if the inmate is placed in (or remains in) segregation, he is given a definite "out" date on which he will be returned to the general population.

With an administrative security segregation, an inmate is not given an "out" date, but his classification status in reviewed weekly by the LCCC's Classification Committee. The inmate is

---

[3] The LCCC's Inmate Handbook states that an inmate who commits a "major violation" may be subject to disciplinary action, including a disciplinary placement in segregation. Pl.'s SoF ¶ 51. Included among the Handbook's list of major violations are offenses such as threatening harm to others and violation of criminal statutes. Inmates on disciplinary segregation status have limited commissary access, are on 23-hour lockdown, are not allowed to attend education services, and can only access the library through a book cart service.

not given an opportunity to be present or heard during these reviews, although he may write an inmate request to bring to the Classification Committee's attention any additional information he wishes to be considered.

On January 13, 2006, Love received a letter from defendant Sergeant David Kirk advising Love that he was being transferred to ASU. That letter stated,

> MR LOVE, YOU HAVE BEEN ASSIGNED TO STATUS 3 SEGREGATION. THIS IS AN ADMINISTRATIVE SEGREGATION AND THE CURRENT CHARGES THAT YOU FACE, NESSITATES [*sic*] THE NEED FOR THIS SEGREGATION.
>
> YOUR SEGREGATION STATUS IS IN THE BEST INTEREST OF YOUR SAFETY AND THE SAFETY AND SECURITY OF THE LAKE COUNTY SHERIFFS ADULT CORRECTIONAL DIVISION. . . .[4]

Dkt. No. 110-6.

Firman has testified that he reclassified Love to ASU for security reasons, in the interest of the safety of Love, LCCC staff, and police officers and other people outside the facility. According to Firman, ASU was the only place in the LCCC where Love's activity, including his contact with other inmates and with the public (over the telephone), could be more tightly controlled and monitored. Love admits that at that time, Firman believed that Love, while housed in the general inmate population at the LCCC, had taken significant steps toward having a police officer murdered. Love asserts, however, that his transfer was motivated not by security

---

[4] This appears to be a paraphrase of the LCCC's Inmate Handbook's policy on protective custody status: "This is done for your safety as well as the safety of other inmates and staff." Inmate Handbook (Dkt. No. 110-9), at 18.

concerns but by a punitive intent "based on the charges that he faced."[5] Pl.'s Resp. to Def.'s SoF ¶ 29 (citing the language of the January 13, 2006 segregation notice).

On February 21, 2006, while he was in ASU, Love passed to Sergeant Novarro a note in which a threat was made against two Lake County judges. Love admits that he passed a note to Novarro and that the note contained the threats against the judges but he denies making those threats. The threats against the judges became part of the information that Firman and the Classification Committee took into consideration in determining not to change Love's classification.

After Love's initial reclassification into ASU, his status, like that of all other inmates in administrative security segregation, was reviewed on a weekly basis by the Classification Committee. The Classification Committee had the authority to recommend changes in an inmate's classification, but Firman had the ultimate authority on inmate classification. Nevertheless, Love remained in ASU for the duration of 2006 based on the information that he had attempted to solicit the murder of a police officer.

According to Firman, all detainees in ASU (whether there for disciplinary or administrative security reasons) were under the same restrictions.[6] While in ASU, Love made

---

[5] Firman testified that when he made the initial decision to transfer Love to ASU, he was unaware of the status of any criminal charges against Love relating to the alleged attempted solicitation of murder and his decision was based solely on the information that CID provided him. Love, however, argues that Firman must have been aware at that time of the status of the criminal solicitation charges because it was at Firman's direction that Sergeant David Kirk sent a letter informing Love that he was being transferred to ASU based on the charges that he faced. Whichever is correct, the decision to segregate Love certainly related to the conduct that underlay the criminal charge.

[6] Love denies that all inmates in ASU were given the same privileges, stating that inmates in disciplinary status are more restricted that inmates in administrative segregation. He relies on

5

requests for certain services which according to the Inmate Handbook were available to administrative security segregation detainees in ASU and not available to those in disciplinary segregation. He received a letter explaining which of those services would be granted and which denied. According to this letter, Love was denied education services and library visitation because he would not be allowed to "openly mix with other inmates." Dkt. No. 110-10 (July 3, 2006 letter from Firman to Love re "Inmate Request dated 6/22/06").

In December 2006, a new Sheriff of Lake County took office and appointed a new Chief of Corrections of the LCCC. On January 11, 2007, Love was reclassified back to the general inmate population.

While he was in ASU, Love was never given a hearing regarding his segregation.[7]

## ANALYSIS

In support of their motion for summary judgment, defendants argue that they had the right to place Love in administrative security segregation without granting him a hearing. Broadly stated, a pretrial detainee is entitled to a hearing to challenge restrictions on his liberty within a jail or detention center only if he is being punished for perceived misconduct. *See Bell* v.

---

the Jail Handbook, page 18, which states a policy that inmates in protective custody status (or administrative segregation for purposes of this case) "may have access" to programs and services such as commissary services, telephone access, and recreational programs. The policy is written in discretionary form, and Firman treated it as such: "It is used to indicate 'the possibility of' [access to programs and services.]" Dkt. No. 110-10 (July 3, 2006 letter from Firman to Love re "Inmate Request dated 6/22/06").

[7] Love admits that even if he had been given a disciplinary hearing, he would not have said anything because he was facing criminal charges regarding the same conduct. Love also cites, however, the Handbook's provision advising inmates that even if they decline to attend a disciplinary hearing, the hearing will be held in their absence. He does not indicate how this might have furthered his cause more than the weekly reviews he was receiving. Love states that he did make inmate requests concerning his classification.

*Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (a pretrial detainee has a due process (liberty) interest in not being punished for the crime for which he is charged). Accordingly, when a pretrial detainee is disciplined for conduct occurring within the jail, he must be provided notice and the opportunity to be heard. *Rapier* v. *Harris*, 172 F.3d 999, 1004–05 (7th Cir. 1999). In *Bell*, the Court held that a class of pretrial detainees, 85% of whom were released within 60 days of being taken into custody and who were held in their rooms not more than eight hours each day (including sleeping time), were not denied due process by being double bunked in a room designed for one, denied access to hardback books other than those mailed directly from commercial sources such as publishers, subjected to searches of their rooms without being able to observe, and subjected to body cavity searches after every contact visit. In reaching this result, the Court laid down the principle that the government may infringe a detainee's liberty where it "take[s] steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees" or otherwise ensure the "effective management of the detention facility." *Bell*, 441 U.S. at 540. In other words, such administrative measures are not punishment and do not invoke due process protections. Love concedes that his case turns on whether the restrictions Firman placed on him were punishment.

To make that determination, *Bell* teaches that unless the custodian's subjective intent is to punish, the restriction is not punishment if it is (a) reasonably related to a legitimate alternative governmental purpose and (b) does not appear excessive in relation to that alternative purpose:

> Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. Thus, if a

7

> particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment."

*Id.* at 538–39 (internal quotation marks and citations omitted). On the other hand, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Id.* at 539. The Court has also emphasized that these inquiries spring from constitutional mandates and that "judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Id.* Indeed, "in the absence of substantial evidence in the record to indicate that the [correctional] officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'" *Id.* at 540 n.23 (quoting *Pell* v. *Procunier*, 417 U.S. 817, 827, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)).

Love asserts that the January 13, 2006 segregation letter is evidence of Firman's express intent to punish him for the solicitation charge. In support of this assertion, Love cites the fact that "[i]mmediately after stating 'this is an administrative segregation' the segregation letter goes on to say[,] 'the current charges that you face, nessitates [*sic*] the need for this segregation.'" Pl.'s Resp. at 6 (quoting the January 13, 2006 letter). Thus, Love contends, "[a]lthough the segregation letter mentions administrative concerns, it explicitly states that the solicitation charges facing Love were the basis for this segregation." *Id.* at 6.

Love relies on *Higgs* v. *Carver*, 286 F.3d 437 (7th Cir. 2002), where the court found the record insufficient to determine whether the plaintiff had been placed in segregation for preventive or punitive purposes and remanded the case for further proceedings on that question.

*Id.* at 438. There, the Seventh Circuit noted that jail authorities sent the plaintiff a letter indicating that he had been "placed on lockdown for repeatedly threatening and harassing other inmates and has continued on lockdown as he has repeatedly cussed and attempted to intimidate correction staff." *Id.* As Love points out, the Seventh Circuit found this language "ambiguous; its wording equally consistent with a punitive purpose and with a preventive purpose." *Id.* at 439. Love argues that the notice of segregation letter he received on January 13, 2006 is similarly consistent with a punitive purpose, even if it mentions safety and security concerns.

Love's attempt to analogize the facts of this case to those in *Higgs*, however, is ultimately unavailing. The evidence simply does not support a finding that the custodian's expressed intent was punitive. Although the letter by referring to the criminal charge for attempted solicitation of murder could be read as consistent with a punitive purpose, inasmuch as soliciting murder through contacts with other inmates is a violation of jail rules as well as the criminal law, the conduct also threatens harm to another and is consistent with a security purpose. Removing Love from contact with other inmates was a logical way to thwart such conduct and thereby protect the victim officer. Simply punishing him for the conduct would not necessarily protect the officer. The letter's explicit paraphrase of the Inmate Handbook's stated reason for protective custody status ("YOUR SEGREGATION STATUS IS IN THE BEST INTEREST OF YOUR SAFETY AND THE SAFETY AND SECURITY OF THE LAKE COUNTY SHERIFFS ADULT CORRECTIONAL DIVISION. . . .") is a clear signal that the express purpose of the segregation was to separate Love from the general population. In *Higgs*, by contrast, the notice did not express an administrative or security concern.

Love offers two other arguments in support of his contention that the segregation was for punitive purposes. He cites a July 3, 2006 letter in which Firman, in response to an inmate request from Love, told him that the restrictions on his access to certain services were based on "the serious nature of [his] criminal actions." Pl.'s Resp. at 7. In full, however, the portion of the letter from which Love quotes reads, "Due to your demonstrated behavior, the serious nature of your criminal actions while in custody, and my concerns for the safety and security of this facility, the following services will not be provided to you . . . ." Dkt. No. 110-10. Again, this language indicates that Love was being treated as one in administrative security segregation status, albeit because of the need to segregate him because of his alleged criminal conduct while in custody.

Love's argument that Firman's punitive purpose can be inferred from the fact the restrictions he imposed on Love were similar to those of inmates placed in disciplinary segregation is not persuasive, either. Love asserts that the LCCC's Inmate Handbook provides that inmates on disciplinary segregation have "minimum privileges" compared to those in administrative security segregation. Pl.'s Resp. at 7. Because Love provides no citation for the quoted language ("minimum privileges"), the court infers that Love is referring to two separate statements in the Handbook: (1) "Inmates on disciplinary detention status have *minimum privileges* (no TV, commissary, outdoor recreation, or out-of-pod activities) and are confined to their cells for a period of 23 hours per day"; and (2) "Inmates in protective custody and inmates housed in the ASU who have not had a disciplinary hearing, may have access to programs and services that include, but are not limited to the following [list] . . . ." Dkt. No. 110-9, at 11 (emphasis added). In their reply, defendants concede that the restrictions on Love were largely

the same as those placed on inmates in disciplinary segregation but assert that all detainees in administrative segregation are similarly restricted. As indicated in the facts, even if Love is correct that different restrictions apply depending on one's status in ASU, it is uncontroverted that Firman had authority to deny any of the privileges to administrative segregation detainees based on their individual situations.

In sum, evidence of Firman's express punitive intent rests entirely on the two letters containing references to Love's criminal conduct while in custody. Even these statements were made in the context of justifying the need to separate him from the general population. The other evidence demonstrates that Love was treated, in terms of privileges, consistently with policies for inmates in administrative segregation status. Love's evidence is insufficient to raise a genuine issue of material fact that Firman's "expressed" intent, under the broad authority given to custodians in *Bell*,[8] was punitive.

In the absence of an expressed intent to punish, the court must next examine whether a genuine issue of facts exists as to whether the restrictions imposed on Love were rationally related to a legitimate, non-punitive governmental purpose. Love has admitted that (1) Firman was advised by CID that while housed in the general inmate population Love attempted to solicit the murder of a police officer involved in his pending case; (2) a legitimate purpose of

---

[8] The breadth of that authority is confirmed by the dissenters in *Bell,* who took issue with the Court's willingness to rest on expressed intent. *See* 441 U.S. at 563 (Marshall, J., dissenting) ("The Court holds that the Government may burden pretrial detainees with almost any restriction, provided detention officials do not proclaim a punitive intent or impose conditions that are 'arbitrary or purposeless.'"); *id.* at 584 (Stevens, J., dissenting) ("[T]he Court seems to say that as long as the corrections officers are not motivated by 'an expressed intent to punish' their wards, and as long as their rules are not 'arbitrary or purposeless,' these rules are an acceptable form of regulation and not punishment.") (citations omitted).

administrative segregation is to prevent harm; and (3) Firman's stated opinion was that ASU was the only place in the LCCC where Love's activity, including his contact with other inmates and with the public (over the telephone), could be more tightly monitored and controlled. Furthermore, Love does not dispute his involvement in communicating a threat against two judges after he was moved to ASU. Under these circumstances, there is no genuine issue of material fact that the restrictions imposed on Love were rationally related to a legitimate governmental purpose of preventing harm to the officer and others.

The final question is whether a fact issue exists concerning whether the restrictions were excessive in relation to the purpose to be served. Love has not argued that the restrictions were excessive in relation to the need to isolate him and prevent harm to others. Although one might offer evidence that confinement in a cell for 23 hours a day for a year is excessive (amounting to cruel and unusual punishment, *see, e.g.*, *Roy* v. *Jenkins*, No. 86 C 5738, 1991 WL 202587, *8 (N.D. Ill. Oct. 3, 1991) ("[T]he cruel and unusual punishment clause of the eighth amendment . . . would have something to say about unending solitary confinement even if state rules gave the warden complete discretion over the subject . . . .") (citations omitted)), Love has not pled or proved such a case.

The court, therefore, concludes that defendants are entitled to summary judgment on Love's due process claim.[9]

---

[9] Because summary judgment is appropriate on this basis alone, the court need not consider the additional grounds asserted by defendants in support of their motion.

## CONCLUSION

Defendants' motion for summary judgment [#94] is granted. Judgment is entered in favor of the defendants. This case is terminated.

Dated: March 18, 2009          Enter:  _____
                                        JOAN HUMPHREY LEFKOW
                                        United States District Judge